**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

KIM WENNET,

        Plaintiff-Appellant,

  v.

ANDREW M. SAUL, Commissioner of
Social Security,

        Defendant-Appellee.

No.   17-16118

D.C. No. 2:15-cv-02459-SPL

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted May 16, 2019
San Francisco, California

Before: WALLACE, IKUTA, and CHRISTEN, Circuit Judges.

    Kim Wennet appeals the denial of her application for Social Security

Disability Insurance Benefits.  We have jurisdiction under 28 U.S.C. § 1291, and

we affirm.

---

    [*]    This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

The Administrative Law Judge (ALJ) provided "specific, clear and convincing reasons" for concluding that Wennet's symptoms were not as severe as she alleged. *Leon v. Berryhill*, 880 F.3d 1041, 1046 (9th Cir. 2017). First, the ALJ relied on the objective medical findings of the consultative examining physician, Dr. Jonathan Baugh. The record establishes that Dr. Baugh conducted a systematic physical examination, recorded detailed notes, and recommended that Wennet had fewer functional limitations than she alleged.[1] Medical reports indicating that the claimant's ailments are not as severe as the claimant alleged constitute significant and substantial reasons to find a claimant's testimony "less than completely credible." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

Second, the ALJ relied on Wennet's choice of more conservative treatment options, including her failure to see a neurologist or to try Botox injections despite multiple recommendations by her treating physician, Dr. Charlene Tobin. "[E]vidence of conservative treatment is sufficient to discount a claimant's

---

[1] The record indicates that Dr. Baugh based his opinion on his review of a Social Security Disability Physical Examination dated January 14, 2010; information provided by Wennet regarding her medical, social, family, and work history; and a comprehensive physical examination. Nothing in the record indicates that the scope of Dr. Baugh's review was inadequate to render an opinion on Wennet's physical condition.

testimony regarding severity of an impairment." *Id.* at 751 (internal quotation marks omitted).[2]

Third, the ALJ concluded that Wennet's activities of daily living indicated that her physical impairments were not as severe as she alleged. This conclusion is supported by substantial evidence in the record, including the following: in April 2012, Wennet traveled to New York City to visit her son and regularly walked up five floors of stairs to visit his apartment; in June 2012, Wennet took a vacation to Italy, and on return Dr. Howland, a treating physician, noted her symptoms were "under relatively good control"; in August 2012, she spent five days packing her parent's home preparatory to a move; in October 2012, she reported she had returned from a vacation to Rocky Point, Mexico, and complained she was now doing all the work required to get a house ready for her parents' move; in November 2012, she reported a sore back from helping her parents move; in March 2013, she took a vacation; in April 2013, she reported walking with her mother three times a week; in June 2013, she traveled to New York again; in September 2013, she went rafting; and in November 2013, she took another four-day trip to Rocky Point, Mexico. Although on occasion Wennet reported pain on return from

---

[2] The record does not include any medical evidence or physician warning indicating that Wennet's use of Botox for the recommended purpose could have damaging side effects.

3

these trips (though in many cases, the pain was unrelated to her dystonia), "[e]ven where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).[3]

The ALJ also provided "specific and legitimate reasons that are supported by substantial evidence" for rejecting the opinions of Wennet's treating physicians. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). The ALJ provided specific and legitimate reasons for discounting the opinion of Dr. Ward, including that Dr. Ward's opinion was conclusory and inconsistent with objective medical evidence and Wennet's daily activities and conservative treatment history. *See Batson v. Comm'r of SSA*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole."). Evidence in the record supports the ALJ's reasons. Dr. Ward's treatment reports were check-the-box forms that provided no reasoning, and thus are entitled to little weight, *see Molina*, 674 F.3d at 1111, and Dr. Ward's summary letter written to assist Wennet in her claim for benefits provided

---

[3] Thus the dissent errs in asserting that activities of daily living are relevant only if they establish a claimant's ability to engage in physical functions transferable to a work setting.

4

conclusions that were unexplained or on issues that are reserved to the Commissioner; *see* 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Moreover, the ALJ's determination that Dr. Ward's opinion was inconsistent with Wennet's reported daily activities and conservative treatment history was supported by the record, as explained above. Finally, Dr. Ward's opinion was inconsistent with Dr. Baugh's opinion, which constitutes substantial evidence because it was supported by other evidence in the record. *See Morgan v. Comm'r of SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

The ALJ also provided specific and legitimate reasons for discounting Dr. Tobin's opinion of Wennet's ability to do work-related activities. Dr. Tobin relied primarily on Wennet's subjective reports of her daily living activities, and her opinion was inconsistent with Dr. Baugh's opinion, Wennet's conservative treatment, and Wennet's activities of daily living. For the same reasons, the ALJ properly rejected Dr. Howland's opinion regarding Wennet's ability to do work related activities. Moreover, Dr. Howland's opinion was inconsistent with Dr. Howland's progress notes indicating that Wennet's condition was under relatively

5

good control.  Finally, neither Wennet's physical therapist nor her acupuncturist is an "[a]cceptable medical source," 20 C.F.R. § 404.1502(a), and the ALJ gave "germane reasons" for discounting those opinions, *Molina*, 674 F.3d at 1111, including that the limitations those providers identified would not have precluded Wennet from working.  "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**AFFIRMED.**

FILED

JUN 27 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

People seeking social security disability benefits sometimes submit functional assessments from treating physicians that rest wholly on their own subjective reports of pain or other disabling symptoms. If an administrative law judge later decides that the claimant's testimony lacks credibility, the foundation for the treating physician's assessment largely fails. This is not such a case. For more than ten years, Kim Wennet's treating providers consistently recorded objective evidence of the severity of her conditions, and those objective indicators formed the basis of their functional assessments. The ALJ decided that Wennet's treating physicians' reports were not as persuasive as a report authored by a consultative examiner. But the consultative examiner met with Wennet just one time and did not review Wennet's extensive medical records. By my read, the ALJ's decision improperly fails to give controlling weight to Wennet's treating physicians' opinions. For this reason, and others explained below, I respectfully dissent.

Pursuant to the Social Security Administration's own regulations, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)) (alterations in original). The majority concludes that the ALJ's decision to disregard three treating physicians' functional assessments is supported by substantial evidence.[1] Our review of the ALJ's decision is *de novo*, and I conclude that the ALJ did not provide "specific and legitimate reasons that are supported by substantial evidence" for discounting the treating physicians' opinions. *Id.* at 674–75 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

The ALJ's written decision does not provide the kind of "specific details" necessary to credit the opinion of a single consultative examiner over the consistent opinions Wennet's treating providers generated throughout her years-long course of treatment. *See id.* at 676. Instead, the ALJ's decision relies on "conclusory determination[s]" that are, in at least some instances, directly contradicted by the record evidence. *Id.*

For example, the ALJ's entire reasoning for discounting Dr. Ward's treating source opinion is contained in a single sentence:

---

[1] I agree with the majority that Wennet's acupuncturist and physical therapist are not "acceptable medical sources" for purposes of the regulations' evidentiary presumption, *see* 20 C.F.R. § 404.1513(a) (2013), and the ALJ need only have "germane reasons" for discounting those opinions. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Although Dr. Ward is a treating source, the undersigned assigns little weight to [his] opinions, as they appear inconsistent with the overall evidence of record, including the consultative examiner's objective findings showing no manipulative or postural limitations, the claimant's consistent conservative treatment history, and her reports of daily living activities.

But Dr. Ward's opinion is entirely consistent with Wennett's overall medical history. He treated Wennet for many years and consistently made physical exam findings that support his assessment of Wennet's functional capacity, as did her other care providers. His treatment notes, spanning the period between early 2010 and August 2013, show objective physical examination findings of restricted motion in Wennet's head and upper spine, tissue changes, asymmetry, and muscle tenderness.

These findings mirror Dr. Tobin's physical examination results, which detail her observations of Wennet's vertebrae compression, violent muscle spasms, and sidebending rotation right of the entire cranial mechanism. The ALJ concluded that Dr. Tobin based her functional assessment primarily on Wennet's own subjective reports of pain, which the ALJ did not credit, but Dr. Tobin's treatment notes directly contradict the the ALJ's premise.

Dr. Tobin's and Dr. Ward's assessments match Dr. Howland's later functional analysis. The sum total of the ALJ's reasoning for discounting Dr.

Howland's report was that Dr. Howland opined on the ultimate issue of disability. This was error. The mere fact that Dr. Howland may have provided an opinion on a legal issue reserved to the agency does not render the rest of her functional assessment invalid. *See, e.g.*, *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). The ALJ also noted that Dr. Howland found Wennet's dystonia under relatively good control in 2012, but did not consider Dr. Howland's subsequent 2013 observation that Wennet's symptoms had progressively worsened, nor did the ALJ account for the fact that Dr. Howland wrote her functional assessment *in 2014*, nearly two years after the progress note the ALJ cited.[2]

Taken together, the record does not substantially support the ALJ's conclusion that Wennet's treating physicians' functional assessments were inconsistent with the medical evidence—indeed, apart from Dr. Baugh's consultative examination, Wennet's treating physician notes *were* the medical evidence.

The ALJ's other reasons for discounting Wennet's treating physicians' assessments are similarly inadequate. With respect to activities of daily living,

---

[2] Wennet worked full-time with her condition through 2006, then reduced her hours to a part-time schedule. She stopped teaching completely in 2009 to focus on treatment, and Dr. Ward explained in an August 2013 letter that "not working" in combination with treatment had led to mild improvement in Wennet's symptoms.

Wennet has never claimed that she is totally disabled, only that her dystonia symptoms prevent her from working at a competitive pace. Activities of daily living can serve as valid reasons to discount contrary medical opinion "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Here, the ALJ did not persuasively explain how or why the odd airplane ride to New York or a few days spent on the beach in Mexico undermined Wennet's doctors' assessments that she cannot sit at a keyboard and type for hours on end, or stand for between six and eight hours in a single workday.[3]

The ALJ's "conservative course of treatment" rationale is certainly not substantial evidentiary support. It is uncontested that Wennet wore a HALO type brace for many years in an effort to continue working. This brace caused headaches and "frequent rib dislocations." Her care providers' records show that, despite her reluctance to use any medications due to concerns about chemical

---

[3] Wennet was able to do some traveling after she began suffering from dystonia, but "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). And the ALJ does not acknowledge that Wennet's travel often exacerbated her symptoms.

dependency, by December of 2014 Wennet had finally resorted to daily hydrocodone to control her pain. The ALJ overlooked this, and his remark that Wennet "has never had any surgery" is both illustrative and concerning; in the same sentence, the ALJ acknowledges that no physician has ever recommended surgery and there is no indication that a surgical fix exists for Wennet's disabling condition. Wennet's decision not to pursue botox injections out of concerns for potentially damaging side effects is not, on its own, a reason to discredit her treating physicians' functional assessments. *See generally Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so."). Unlike the majority, I find Wennet's concerns about the possibility of damaging side effects from Botox adequately explain her decision not to pursue that course of treatment.[4]

The ALJ relied on Dr. Baugh's consultative examination report to discount the entirety of Wennet's ten-plus-year medical history, but Dr. Baugh's report is a flimsy counterweight. Dr. Baugh formed his opinion based on a single, brief

---

[4] "Botox injections use a toxin called onobotulinumtoxinA to temporarily prevent a muscle from moving. This toxin is produced by the microbe that causes botulism, a type of food poisoning." Mayo Clinic, https://www.mayoclinic.org/tests-procedures/botox/about/pac-20384658 (last visited Jun. 4, 2019).

6

examination and, remarkably, without *reviewing Wennet's medical history*. Instead, Dr. Baugh reviewed just one other consulting examiner's outdated report from a period that predates the onset of Wennet's disability. If Dr. Baugh had consulted Wennet's treating providers' records from the relevant period, he could not have missed repeated objective physical examination results supporting their functional assessments. Notably, Dr. Baugh's opinion agreed with Wennet's treating providers on her dystonia diagnosis, and he did not rely on "objective clinical tests that [Wennet's treating providers] had not considered." *Orn*, 495 F.3d at 633. Given these circumstances, Dr. Baugh's wildly divergent functional assessment is difficult to credit and does not amount to sufficient justification for disregarding the opinions of the physicians who have been treating Wennet for years on end: Dr. Tobin, Dr. Ward, and Dr. Howland. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) ("a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.1989)).

Finally, the majority discredits some of Wennet's medical sources because their "treatment reports were check-the-box forms that provided no reasoning." Maj. Op. at 4. "A reviewing court may only consider the reasons provided by the

7

ALJ in the disability determination and 'may not affirm the ALJ on a ground upon which he did not rely.'" *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014)).  We have affirmed an ALJ's decision to disregard treating physicians' assessments that consist *only* of summary checkbox forms, *see Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), but the record in Wennet's case is replete with objective examination results and narrative descriptions that support her treating providers' functional assessments.  The majority overlooks that the ALJ himself acknowledged that Dr. Tobin provided a narrative report along with a check-box form.  Wennet's case is thus easily distinguishable from one like *Molina*, where a *non-medical* treating source completed a *single* functional assessment by checking boxes without providing narrative descriptions even though the form called for that kind of explanation.  *See id.* at 1111–12.

  We have said in similar cases that "[t]he ALJ must do more than offer his conclusions" when discounting a treating source's functional assessment.  *Orn*, 495 F.3d at 632 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  Here, the ALJ's written decision did not meet that standard.  For these reasons, I respectfully dissent.

8